## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| ROBERT BERG, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | Case No. _____ |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| PANERA BREAD COMPANY, RONALD M. SHAICH, WILLIAM W. MORETON, DOMENIC COLASACCO, DIANE HESSAN, FRED FOULKES, LARRY FRANKLIN, THOMAS E. LYNCH, MARK STOEVER, JAMES WHITE, RYE PARENT, CORP., RYE MERGER SUB, INC., and JAB HOLDINGS B.V., | ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED CLASS ACTION |
| Defendants. | ) | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This action stems from a proposed transaction announced on April 5, 2017 (the "Proposed Transaction"), pursuant to which Panera Bread Company ("Panera" or the "Company") will be acquired by JAB Holdings B.V. ("JAB Holdings"), Rye Parent, Corp. ("Parent"), and Rye Merger Sub, Inc. ("Merger Sub" and together with JAB Holdings and Parent, "JAB").

2. On April 4, 2017, Panera's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with JAB.  Pursuant to the terms of the Merger Agreement, shareholders of Panera will receive $315.00 per share in cash.

3.      On June 1, 2017, defendants filed a proxy statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.      The Proxy Statement, which scheduled a stockholder vote on the Proposed Transaction for July 11, 2017, omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.  Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Panera common stock.

9.      Defendant Panera is a Delaware corporation and maintains its headquarters at 3630 South Geyer Road, Suite 100, St. Louis, Missouri 63127.  Panera's common stock is traded on the NasdaqGS under the ticker symbol "PNRA."

10.      Defendant Ronald M. Shaich ("Shaich") is a director, founder, Chairman, and Chief Executive Officer ("CEO") of Panera.

11.      Defendant William W. Moreton ("Moreton") has served as a director of Panera since May 2010 and as Executive Vice Chairman since August 2013.

12.      Defendant Domenic Colasacco ("Colasacco") has served as a director of Panera since March 2000 and as Lead Independent Director since March 2008.

13.      Defendant Diane Hessan ("Hessan") has served as a director of Panera since November 2012.

14.      Defendant Fred Foulkes ("Foulkes") has served as a director of Panera since June 2003.

15.      Defendant Larry Franklin ("Franklin") has served as a director of Panera since June 2001.

16.      Defendant Thomas E. Lynch ("Lynch") has served as a director of Panera since March 2010.  Lynch previously served as a director of Panera from June 2003 until December 2006.

17.      Defendant Mark Stoever ("Stoever") has served as a director of Panera since January 2016.

18.      Defendant James White ("White") has served as a director of Panera since January 2016.

19.     The defendants identified in paragraphs 10 through 18 are collectively referred to herein as the "Individual Defendants."

20.     Defendant Parent is Delaware corporation, an affiliate of JAB Holdings, and a party to the Merger Agreement.

21.     Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

22.     Defendant JAB Holdings is a privately held limited liability company incorporated under the laws of the Netherlands.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Panera (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

24.     This action is properly maintainable as a class action.

25.     The Class is so numerous that joinder of all members is impracticable.  As of April 30, 2017, there were approximately 21,338,692 shares of Panera Class A common stock outstanding, 1,381,730 shares of Class B common stock outstanding, 18,174 shares of common stock underlying options with an exercise price below the per share merger consideration of $315.00, and 54,100 shares of common stock underlying stock appreciation rights with a reference price below the per share merger consideration of $315.00, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

26.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

27.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

28.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

29.    Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company and the Proposed Transaction

30.    Panera began in 1981 as Au Bon Pain Co., Inc.  Founded by Louis Kane and Individual Defendant Shaich, the Company prospered along the east coast of the United States and internationally throughout the 1980s and 1990s and became the dominant operator within the bakery-cafe category.

31.    In 1993, Au Bon Pain Co., Inc. purchased Saint Louis Bread Company®, a chain of twenty bakery-cafes located in the St. Louis area.

32.    The Company then managed a comprehensive re-staging of Saint Louis Bread Co. Between 1993 and 1997 average unit volumes increased by 75%.  Ultimately, the concept's name

was changed to Panera Bread.

33.    In May 1999, all of Au Bon Pain Co., Inc.'s business units were sold, with the exception of Panera Bread, and the Company was renamed Panera Bread.

34.    Since those transactions were completed, the Company's stock has grown significantly, and today it has a market capitalization of $4.5 billion.

35.    Panera was recognized as one of Business Week's "100 Hot Growth Companies."

36.    In 2007, Panera purchased a majority stake in Paradise Bakery & Café®, a Phoenix-based concept with over seventy locations in ten states predominantly in the west and southwest. The Company purchased the balance of Paradise in June 2009.

37.    As of September 27, 2016, there are 2,024 bakery-cafes in forty-six states, the District of Columbia, and in Ontario, Canada operating under the Panera Bread®, Saint Louis Bread Co.®, and Paradise Bakery & Café® names.

38.    On April 4, 2017, the Individual Defendants caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

39.    The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Sections 6.3(a) and (e) of the Merger Agreement provide, in relevant part:

(a) No Solicitation or Negotiation. The Company agrees that, except as expressly permitted by this Section 6.3, neither it nor any of its Subsidiaries shall, directly or indirectly, nor shall it authorize or permit their respective Representatives directly or indirectly to:

(i) initiate, solicit, knowingly encourage, induce or assist any inquiries or the making, submission, announcement or consummation of any proposal or offer that constitutes, or could reasonably be expected to lead to, any Acquisition Proposal;

(ii) engage in, continue or otherwise participate in any discussions or negotiations regarding, or provide or furnish any information or data relating to the Company or any of its Subsidiaries (other than to notify a Person of the provisions of this Section 6.3), or afford access to the business, properties, assets, books, records or personnel of the Company or any of its Subsidiaries to any Person (other than Parent, Merger Sub, or any of their respective Affiliates, designees or Representatives) that could reasonably be expected to initiate, solicit, encourage, induce or assist the making, submission or commencement of any proposal or offer that constitutes, or could reasonably be expected to lead to, any Acquisition Proposal;

(iii) approve, recommend or enter into, any letter of intent or similar document, agreement or commitment, or agreement in principle (whether written or oral, binding or nonbinding) with respect to an Acquisition Proposal (other than a confidentiality agreement contemplated by this Section 6.3); or

(iv) otherwise knowingly facilitate any effort or attempt to make an Acquisition Proposal.

(e) Existing Discussions and Agreements. The Company agrees that it will, and will cause its Subsidiaries and its and their respective Representatives to, immediately cease and terminate any existing activities, discussions or negotiations with any Persons conducted heretofore with respect to any Acquisition Proposal. The Company also agrees that (i) it will promptly request each Person that has executed a confidentiality agreement prior to the date of this Agreement in connection with such Person's consideration of an Acquisition Proposal to return or destroy all confidential information heretofore furnished to such Person or its Representatives by or on behalf of the Company or any of its Subsidiaries, (ii) the Company and its Subsidiaries shall not release any party from, or terminate, waive, amend or modify any provision of, or grant permission under, any confidentiality or standstill provision in any agreement to which the Company or any of its Subsidiaries is a party; provided, however, that if the board of directors of the Company determines in good faith, after consultation with outside counsel, that it would reasonably be expected to be inconsistent with the board of directors' fiduciary duties under applicable Law not to do so, the Company may waive any standstill or similar provisions in such agreements to the extent necessary to permit a Person to make on a non-public basis to the board of directors of the Company, an Acquisition Proposal, conditioned upon such Person agreeing to disclosure of such Acquisition Proposal to Parent and Merger Sub, in each case as contemplated by and subject to compliance with this Section 6.3 and (iii) the Company shall, and shall cause its Subsidiaries to enforce, to the fullest extent permitted under applicable Law, the other provisions of any such agreement, including by obtaining injunctions to prevent any breaches of such agreements and to enforce specifically the terms and

provisions thereof in any court of the United States of America or of any state having jurisdiction. Nothing contained in this Section 6.3(e) shall be deemed to prohibit the Company from disclosing any information to the extent necessary to comply with its fiduciary duties under applicable Law or any disclosure obligations under applicable U.S. federal or state Law with regard to an Acquisition Proposal.

40.    Further, the Company must promptly advise JAB of any proposals or inquiries received from other parties.  Section 6.3(f) of the Merger Agreement states:

(f) Notice. The Company agrees that it will promptly (and, in any event, within 24 hours) notify Parent if any inquiries, proposals or offers with respect to an Acquisition Proposal are received by, any such information is requested from, or any such discussions or negotiation are sought to be initiated or continued with, it or any of its Representatives indicating, in connection with such notice, the name of such Person and the material terms and conditions of any proposals or offers (including copies of any written requests, proposals or offers, including proposed agreements) and thereafter shall keep Parent informed, on a current basis, of the status and terms of any such proposals or offers (including any amendments thereto and, in no event later than 24 hours after receipt, copies of any additional or revised written requests, proposals or offers, including proposed agreements) and the status of any such discussions or negotiations, including any change in the Company's intentions as previously notified. The Company agrees that it and its Subsidiaries will not enter into any agreement with any Person subsequent to the date hereof that prohibits the Company from providing any information to Parent in accordance with this Section 6.3(f). Without limiting the generality of the foregoing or Section 6.3(a), the Company shall notify Parent in advance of beginning to provide information to any Person relating to an Acquisition Proposal or beginning discussions or negotiations with any Person regarding an Acquisition Proposal.

41.    Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants JAB a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 6.3(c) of the Merger Agreement states:

Notwithstanding anything to the contrary set forth in this Agreement, prior to the Requisite Company Vote, the board of directors of the Company may make a Change of Recommendation (and, solely with respect to a Superior Proposal, terminate this Agreement pursuant to Section 8.3(b)) if and only if (A) the board of directors of the Company has determined in good faith (after consultation with its outside financial advisors and outside legal counsel) that the failure to effect a Change of Recommendation would reasonably be expected to be inconsistent with the directors' fiduciary duties under applicable Law and (B) the Company complies

with the provisions of this Section 6.3(c), it being understood that the board of directors of the Company may make a Change of Recommendation only in response to (1) any Acquisition Proposal that constitutes a Superior Proposal or (2) an Intervening Event; provided, however, that no such action may be made pursuant to this Section 6.3(c) or Section 8.3(b) until after the fourth Business Day following Parent's receipt of notice from the Company (as may be extended or renewed pursuant to this paragraph, the "Notice Period") advising that management of the Company currently intends to recommend to its board of directors that it take such action and the basis therefor, including (i) in the case of any Acquisition Proposal all necessary information under Section 6.3(f) (which notice shall not constitute a Change of Recommendation) and (ii) in the case of an Intervening Event, a reasonably detailed description of the Intervening Event; provided, further, that (i) during the Notice Period, the Company shall and shall cause its Subsidiaries not to enter into any Alternative Acquisition Agreement, (ii) the Company shall negotiate, and shall direct its financial advisors and outside legal counsel to negotiate, with Parent in good faith during the Notice Period (to the extent Parent desires to negotiate) to enable Parent to propose revisions to the terms of this Agreement that obviate the need of the board of directors of the Company to make a Change of Recommendation or terminate this Agreement pursuant to Section 8.3(b), including in the case of a Superior Proposal, by such Superior Proposal no longer constituting a Superior Proposal, (iii) following the end of the Notice Period, the board of directors of the Company shall have considered in good faith any changes to the terms of this Agreement proposed by Parent and any other information provided by Parent and shall have determined (after consultation with its outside financial advisors and outside legal counsel) that if such changes were to be given effect that failure to make a Change of Recommendation or terminate this Agreement pursuant to Section 8.3(b) would reasonably be expected to be inconsistent with the directors' fiduciary duties under applicable Law and, in the case of clause (1) above, any such Superior Proposal would continue to constitute a Superior Proposal (or, in the case of a Change of Recommendation that is related to an Intervening Event, the failure to make such Change of Recommendation would be inconsistent with the directors' fiduciary duties under applicable Law) and (iv) in the event of modifications to the financial terms (including the form, amount and timing of payment of consideration) or any other material terms of any Superior Proposal, the Company shall, in each case, have delivered to Parent an additional notice consistent with that described in the first proviso of this paragraph and a new Notice Period under this paragraph shall commence, during which time the Company shall be required to comply with the requirements of this Section 6.3(c) anew with respect to such additional notice, including clauses (i) through (iv) of this proviso, provided, that any such additional Notice Period shall end after the third Business Day following Parent's receipt of such notice from the Company. Notwithstanding the foregoing, to the extent that a notice is required under this Section 6.3(c) (in connection with a termination pursuant to Section 8.3(b)) relates to a Superior Proposal for which the requisite notice or additional notice has been given pursuant to this Section 6.3(c) (in connection with a Change of

Recommendation), no new or additional notice or Notice Period will be required for such termination pursuant to Section 8.3(b).

42.     Further locking up control of the Company in favor of JAB, the Merger Agreement provides for a "termination fee" of $215 million payable by the Company to JAB if the Individual Defendants cause the Company to terminate the Merger Agreement.

43.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

44.     Additionally, Individual Defendant Shaich and certain of his affiliates entered into a voting agreement, pursuant to which they have agreed to vote their shares in favor of the Proposed Transaction.  Accordingly, approximately 15.5% of the Company's shares are already locked up in favor of the merger.

45.     The merger consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

46.     Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

47.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

***The Proxy Statement Omits Material Information, Rendering It False and Misleading***

48.     Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

49.     The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

50.     First, the Proxy Statement omits material information regarding Panera's financial projections and the financial analyses performed by the Company's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley"), in support of its so-called fairness opinion.

51.     With respect to Panera's financial projections, the Proxy Statement fails to disclose: (i) a reconciliation of all non-GAAP to GAAP metrics; (ii) interest; (iii) taxes; (iv) depreciation and amortization; (v) changes in working capital; (vi) capital expenditures; (vii) the certain after-tax one-time items of the Company; (viii) cash flow from other investing activities; and (ix) the "Street Consensus Case" projections.

52.     With respect to Morgan Stanley's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose:  (i) the constituent line items used in calculating unlevered free cash flow; (ii) the estimated terminal value of Panera; (iii) the estimated total debt, non-controlling interest and cash, cash equivalents, and marketable securities for Panera, as provided by the Company's management; (iv) the inputs and assumptions underlying the discount rate range of 5.7% to 7.5%; and (v) the number of fully diluted shares of Panera common stock outstanding as of December 31, 2016, as provided by the Company's management.

53.     The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.  Moreover, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

54.     The omission of this material information renders the Proxy Statement false and

misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger; Recommendation of the Board"; (iii) "Opinion of Morgan Stanley & Co. LLC"; (iv) "Summary of Material Financial Analyses"; and (v) "Certain Company Forecasts."

55.    Second, the Proxy Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

56.    Specifically, the Proxy Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of Panera's officers and directors, including who participated in all such communications.

57.    Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

58.    The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger; Recommendation of the Board"; and (iii) "Interests of Certain Persons in the Merger."

59.    Third, the Proxy Statement omits material information regarding potential conflicts of interest of Morgan Stanley.

60.    For example, the Proxy Statement fails to disclose the nature of the services Morgan Stanley has provided to JAB and its affiliates in the past two years.

61.    Additionally, the Proxy Statement fails to disclose Morgan Stanley's holdings in JAB's and its affiliates' stock.

62.    Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

63.    The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Background of the Merger"; (ii) "Reasons for the Merger; Recommendation of the Board"; (iii) "Opinion of Morgan Stanley & Co. LLC"; and (iv) "Summary of Material Financial Analyses."

64.    The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Panera's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Panera**

65.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

66.    The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. Panera is liable as the issuer of these statements.

67.    The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

68.    The Individual Defendants were at least negligent in filing the Proxy Statement

with these materially false and misleading statements.

69.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.   In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

70.     The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

71.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

72.     Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

<u>**COUNT II**</u>

**Claim for Violation of Section 20(a) of the 1934 Act**
**Against the Individual Defendants and JAB**

73.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

74.     The Individual Defendants and JAB acted as controlling persons of Panera within the meaning of Section 20(a) of the 1934 Act as alleged herein.   By virtue of their positions as officers and/or directors of Panera and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

75.     Each of the Individual Defendants and JAB was provided with or had unlimited

14

access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

76.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly in the making of the Proxy Statement.

77.    JAB also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

78.    By virtue of the foregoing, the Individual Defendants and JAB violated Section 20(a) of the 1934 Act.

79.    As set forth above, the Individual Defendants and JAB had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.    Preliminarily and permanently enjoining defendants and all persons acting in

concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated:  June 8, 2017                              **CAREY DANIS & LOWE**

                                        By:   */s/James J. Rosemergy*
                                        James J. Rosemergy (MO#50166)
                                        8235 Forsyth, Suite 1100
                                        St. Louis, MO 63105
                                        Telephone: (314) 725-7700
                                        Facsimile: (314) 721-0905
                                        Email: jrosemergy@careydanis.com

                                        *Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
Brian D. Long
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Telephone: (302) 295-5310

Facsimile: (302) 654-7530
Email: bdl@rl-legal.com
Email: gms@rl-legal.com

**RM LAW, P.C.**
Richard A. Maniskas
1055 Westlakes Drive, Suite 3112
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile: (484) 631-1305
Email: rm@maniskas.com